(Decided 15th July, 1879.)

THE STATE OF MARYLAND *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE. THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* THE STATE OF MARYLAND.

*Construction of the Bounty Act of 1864, ch. 15, as to how the Money drawn thereunder from the State by the City of Baltimore was to be applied—Question as to the power of the State to make the City liable for the misapplication by the City Register of funds required by said Act to be disbursed by him—Construction of the word "Misapplication," as*

State *vs.* Mayor, &c. of Baltimore.

*applying to cases of payment to the Wrong person or to the same person Twice—Discretion of the Register .as to how each Payment should be made and how Evidenced—Sufficiency of Evidence to show that Vouchers of payments alleged to be Lost, once existed—Sufficiency of Evidence of their loss so as to render Secondary evidence of their Contents admissible— Payments made under the Act of 1864 not affected by the Act of 1867, ch. 167, requiring different Vouchers from those required by the former Act.*

The Act of 1864, ch. 15, authorized the Governor to offer a bounty to persons volunteering to serve as a part of the quota of this State in the armies of the United States; a portion of the amount to be paid at the time of being mustered into service, a portion at the end of each month of service for the five months immediately ensuing, and the balance at the expiration of the time of service or upon honorable discharge therefrom. By said Act the Commissioners for the several counties, and the Mayor and City Council of Baltimore, " upon forwarding to the governor *properly authenticated lists,* of volunteers mustered under this Act, in their respective Counties and the City of Baltimore, are hereby authorized and empowered *upon the certificate of the Governor* to draw upon the Treasurer for the sum or sums necessary to pay the cash and monthly payments to which *said volunteers* would be entitled.as the same may become due, retaining in the Treasury the balance until the expiration of their terms of service." A large number of such lists duly authenticated by the proper military officials, and termed " Governor's Rolls," were forwarded to the Governor. Upon the receipt of each the Governor appended thereto his certificate, directed " To the Mayor and City Council of Baltimore," certifying the authenticity of the list, and that the volunteers mentioned therein, were properly to be credited to the City of Baltimore, and that " *you* " are entitled to receive from the Treasury of the State the amount specified in the certificate as required to make the cash and monthly payments to the volunteers named in the list; and that " *you* are therefore authorized to draw upon the Treasurer of the State for said amount as per draft hereto annexed, which you will sign and present at the Treasury." Payment of such amount was in each case made upon a draft endorsed upon the certificate, and signed by " J. A. T., City Register," each draft stating that the amount drawn for was " required to make the cash and monthly payments to the " *   *   *

"volunteers within named under the provisions of the Act" of 1864. HELD:

That this action was in strict compliance with the provisions of the Act of 1864, by the terms of which the money so drawn from the treasury, should be applied *only* for the purpose of making the requisite payments to or for the benefit of the persons whose names should appear *on the list* thus forwarded to and certified by the Governor.

The same Act provides "That the County Commissioners and the Register of the City of Baltimore shall disburse the sums so coming into their hands, and *shall keep a record thereof;* but no County or the City of Baltimore shall draw for and be paid a larger sum than may be necessary for their respective quotas; and the several Counties and the City of Baltimore shall be liable to the State for any *misapplication* of the said funds by the County Commissioners or the City Register. In an action by the State against the Mayor and City Council of Baltimore, it was HELD:

1st. That it was competent as well as just for the Legislature to impose upon the Counties and the City of Baltimore liability for the default of such officers appointed by the Mayor and City Council, or elected by the people of the counties, as it might designate as the proper agents to disburse the said money in the mode and manner provided.

2nd. That disbursements to parties whose names do not appear on the "Governor's Rolls," or payment to the same person more than once, were *misappropriations* within the meaning of the statute for which the city was properly liable.

3rd. That whether payment should be made to each volunteer in person, or upon his order, and whether such order should be in writing, and how evidenced, were all matters intrusted to the discretion of the Register, and his decision thereon, if honestly made, was final.

By a resolution of the Mayor and City Council, the Register was authorized to employ an additional clerk to assist him in discharging the duty of disbursing said bounty money. This clerk, together with the Register himself, who made most of the disbursements, and his successor in office who made the rest, all testified to the effect that it was the invariable practice of the Register's office to require proper and sufficient powers of attorney, orders, or assignments, and in all cases of doubt to consult the City Counsellor; that such orders or powers of attorney were in all cases before

them when disbursements were made thereon; and that in no case would any payment have been made without the production and existence of such vouchers. The testimony of these Registers and their clerk was corroborated by that of a large number of witnesses who had dealings with the office and to whom payments were made upon powers of attorney not produced in evidence. HELD:

1st. That this proof was sufficient to establish the fact, that vouchers which the Register in good faith decided to be sufficient to authorize payments thereunder, in cases where they had not been produced, and were alleged to be lost, once existed.

2nd. That the loss of these papers, and an unavailing and sufficient search for them in the places where they were kept, and where they ought to have been found if in existence, were sufficiently established by the proof to render the testimony of said witnesses admissible to prove the contents of these lost vouchers; and that under the circumstances of the case their contents were sufficiently proven, to justify the exoneration of the city from liability for the payments in dispute made thereunder.

3rd. That as the disbursements in controversy were all made under the provisions of the Act of 1864, the Register could not be required under the Act of 1867, ch. 167, to produce any different vouchers from those he was required by the Act of 1864 to keep.

CROSS APPEALS from the Superior Court of Baltimore City.

This action was brought by the State of Maryland against the Mayor and City Council of Baltimore to recover:

1. Money paid by the plaintiff for the defendant, at its request.

2. And for money received by the defendant, for the use of the plaintiff.

3. And for money found to be due from the defendant to the plaintiff, on accounts stated between them.

4. And for that, John A. Thompson, Register of the said Mayor and City Council of Baltimore, received from said State certain sums of money, to be disbursed by him

under the Bounty laws of the said State; but the said Register did not disburse the same in accordance with said law, but misapplied the same.

The defendant pleaded *non assumpsit* and *nil debet*, and on these pleas issues were joined.

The cause was then referred to the auditor of the Court, by consent of counsel and sanction of the Court.

After the report of the auditor was made, accompanied by depositions taken before him, the nature of which is sufficiently stated in the opinion of this Court, the cause was submitted by agreement of counsel to the Court below for determination, without the intervention of a jury.

At the trial prayers were offered on the part of the plaintiff and defendant which it is not necessary to insert, as the Court, (Dobbin, J.,) in his action thereon stated that he referred more particularly to the following opinion as indicating more exactly his ruling:

"This action is instituted by the State against the city, to recover from the latter such balance of the sum of $830,250, as may remain in its hands after crediting all proper payments on account of enlisted volunteers in the late war, under the Act of Assembly of 1864, chap. 15, sections 6 and 7. That Act, in substance, provided, that the counties and the City of Baltimore should respectively draw upon the Treasurer of the State of Maryland, for the sums necessary to pay the cash and monthly payments of such volunteers as should be mustered into service, and be certified to the Governor upon properly authenticated lists, of the disbursements of which, the County Commissioners and the Register of the city were to keep a record, and the counties and the city were to be held liable for any misapplication of said funds.

"Under the provisions of this Act, the Mayor and City Council of Baltimore furnished to the Governor, properly authenticated lists of the volunteers mustered in as the

quota of the city, and received the sum above named, to be paid to the volunteers so mustered in.

"Upon being called upon to render its record of disbursements, it is found that payments have been made to persons not on the lists furnished to the Governor, and to others upon alleged insufficient evidence of the right to receive such payments, and upon other names payments have been made twice, and for their alleged misapplication of funds, the State seeks to hold the city liable in this action.

"Preliminary to the questions of accountability as between principal and agent, which are thus raised, the city defends itself upon several grounds going to the right of the State to recover at all. These are, that it was not competent for the State to impose upon the city the duty of disbursing the bounties in question, and that whatever was lawfully imposed by the Act was upon the Register personally, who was thus made the State's agent in that behalf, and could not involve the city in any responsibility for his default.

"To this view I cannot subscribe. It is abundantly shown by authority and upon principle, that the State was acting within its constitutional authority in adopting this method of relieving its citizens from the burthen of an involuntary draft, and that it had the right to use the agency of municipal officers to carry this purpose into effect.

"It will further appear upon a proper construction of the Act, that the State was dealing directly with the counties and the city, and their corporate municipal relations, and that mention is made of 'County Commissioners' and of the 'Register,' only as the proper agencies through whom such dealings were to be consummated, the liability of the counties and city, respectively, for any misapplication of the funds, being expressly reserved. Nor did it require any acceptance on the part of

the counties and city to make the duty imposed by the Act obligatory upon them.

"The State had a right to impose it, as a public duty, even against their will.

"But if such acceptance should be thought necessary, it will be found in the fact that those bodies respectively furnished the properly authenticated lists to the Governor, upon the basis of which the money was drawn from the treasury. I think, therefore, that no defence can be successfully founded upon these objections, and that the City of Baltimore must account for the proper disbursement of the fund within the purposes of the Act. The question is now, how far has it so accounted?

"The city was entitled to draw these funds only for names on the lists furnished to the Governor. To the extent to which it claims credit for payments to, or on behalf of, any names not on their lists, I think it very clear that the claim cannot be allowed. So, also, where it has been paid twice upon the same name, it should be credited with one payment.

"The material question is, how far is the city discharged by the proof in the cause, as to payments made to or on behalf of names on the Governor's lists? In considering this question, it must be borne in mind that the defendant is the City of Baltimore, a municipal corporation, which can only act through agents, and the fact to be proved is the payment of these moneys to or on behalf of the persons on the Governor's lists.

"Payment is a fact which may be proved by the oral testimony of any *witness who has knowledge of it*, and who will swear to it.

"In a case like this, involving dealings with more than three thousand persons, strangers to him, he need not have distinct recollection of each individual, and of the payment to him, *but if he has made a record at the time*, and producing the record is able to testify from it, he has done all that the case can reasonably require of him.

State *vs.* Mayor, &c. of Baltimore.

"In this case, the city produces John A. Thompson, Jr., a witness not attempted to be impeached, who swears that he was a clerk in the office of the Register of the city; that he produces the records in which the payments are entered; that all the payments claimed were in fact made to the enlisted parties themselves, or to persons lawfully authorized by them to receive them. There is, besides, other strong corroborative proof not necessary to be here referred to. This would seem to be sufficient to discharge the city, unless it be considered that the State has a right to review the authority upon which payment was made to others than the soldiers themselves, and recover for any mistake in judgment the disbursing officer may have made, though he may have acted honestly, and the State may have suffered no loss by reason of such mistake. It must be remembered that there is no fraud or corrupt dealing charged or intimated in this case; as the proof stands, the money was honestly paid to somebody, and the State has received the military service of some one as the equivalent of such payment; it is moreover admitted that no claim has been made against the State for money alleged to have been paid by the city. The question as to the authority of the payee to receive the payment, was strictly a judicial question, and as between the State and the city, its determination rested alone, in the absence of any other provision, with the officer charged with making the payment. If he has performed that duty honestly, the State has no right to review his judgment, and make the city responsible for his error, especially where the State has suffered no loss by it. The only requirement of the Act of Assembly in this case is, that the disbursing officer shall keep a record of his disbursements. This the city has done, and adds to it the proof, by witnesses, that all the money claimed to have been paid to the persons named in the Governor's lists, was in fact paid to them, or to persons authorized by them to receive it.

" This would seem to be sufficient under the ruling of Judge Story in *Allen vs. Blunt,* 3 *Story,* 745, in which he says : 'It may be laid down as a general rule, that when a particular authority is confided to a public officer, to be exercised by him in his discretion, upon an examination of facts of which he is made the appropriate judge, his decision upon those facts is, in the absence of any controlling provision, absolutely conclusive as to the existence of those facts.'

" But this is not the only view the record before me presents. It is proved by the witnesses that when payments were made to others than the soldiers themselves, it was the invariable practice of the Register's office to require legally sufficient powers of attorney or assignments, justifying such payments, and the witness, Thompson, Jr., swears to his belief, that he made all the payments objected to on such papers, and proof was offered tending to show the loss of such papers, and an unavailing search for them in the places where they should be found. The once existence of a paper, its loss and the sufficiency of a search for it, are questions for the Court; and I do not hesitate to say, no fraud being charged, that if I were trying this case before a jury, I should admit secondary evidence of the contents of such papers.

" Is there then any objection to such evidence as legally admissible to go to a jury ? I recognize no such inadmissibility. When a paper or record is alleged to be lost, which, by the uniform usage of a public office must have existed to justify some proceeding, the evidence of which does exist, surely such usage may be proved to the jury, in connection with the proof of the fact from which its existence may be inferred. Here the payment is proved, and the record of such payment is preserved in the handwriting of the person who made it. Surely his testimony that he would not have made it without the production to him of the proper authority to justify his making it, ought to go to the jury for what it is worth. If then it

is, as matter of law, admissible to go the jury, the only remaining question is, is it sufficient as matter of fact to satisfy me, acting in the place of a jury, of the actual payment, upon legally sufficient authority, of the sums claimed by the city to have been paid?

"Looking at the class of people, who were for the most part the recipients of this money, their uncertainty of habitation, and the great difficulty of finding them; looking at the fact that no claim has been made on the State on behalf of any of them since the war, notwithstanding the well known diligence and enterprise of those who were engaged in the business of attending to bounties; and looking at the fact that no charge of fraud is made or intimated, I do not hesitate to acquit the city of all claim by the State, except for such sums as may be paid to or an account of persons not on the Governor's lists, and for such sums as have been erroneously paid a second time. The auditor of the Court, to whom the parties and the Court are already indebted for a most lucid and exhaustive examination of this case, will state the liability of the city in conformity with this opinion, when I will enter a verdict and judgment accordingly.

"My opinion is herein sufficiently indicated to render it unnecessary to pass separately upon the propositions submitted to me."

The auditor stated an account in accordance with said opinion, which was adopted by the Court, and verdict and judgment were entered accordingly.

Both the plaintiff and defendant appealed.

The cause was submitted on briefs to BARTOL, C. J., BRENT, MILLER, ALVEY, ROBINSON, and IRVING, J.

*A. Leo Knott* and *Charles J. M. Gwinn, Attorney General,* for the State.

The question, in a case tried by the Court, without the intervention of a jury, is, whether the evidence upon which

the Court acted was legally sufficient to lead the Court to the conclusions which it reached by its particular determinations. *Sheppard and Jones vs. Willis and Ravel*, 28 *Md.*, 633, 634.

It was provided by the Act of 1864, chapter 15, that the Governor should notify the Commissioners of the several counties and the Mayor and City Council of Baltimore of the number of men for which they were liable under drafts to be made under existing calls by the Federal Government; and the said Commissioners, or Mayor and City Council, upon forwarding to the Governor properly authenticated lists of volunteers mustered in under the Act in their respective counties and in the City of Baltimore, were *authorized and empowered*, upon the certificate of the Governor, to draw upon the Treasurer for the sum or sums necessary to pay the cash and monthly payments to which said volunteers would be entitled, as the same might come due; retaining the balance in the treasury until the expiration of the term of service of such respective volunteers.

The Act of 1864, chapter 15, did not impose upon the Commissioners of the several counties, or upon the Mayor and City Council of Baltimore, any *obligation* to receive the money in question. The Act only enabled them, respectively, to obtain such money from the State, if they saw proper to relieve their populations from the inconvenience of the proposed drafts by procuring, by means of bounties, a sufficient number of volunteers. They were, respectively, at liberty to become the disbursing agents of the State for this purpose, or to decline the trust.

The Superior Court of Baltimore City found as facts that the Mayor and City Council of Baltimore furnished to the Governor properly authenticated lists of the volunteers constituting the quota of the city, and received, through its proper officer, from the State the sum of $830,250, to be paid to such volunteers.

Under the sixth and seventh sections of the Act of 1864, chapter 15, the Register of the City of Baltimore was directed to disburse the money thus paid to the enlisted volunteers credited to the City of Baltimore, as the same might become due, and to keep a record of such disbursements; and it was provided that the City of Baltimore should be "*liable to the State for any misapplication of said funds by the said City Register.*"

The office of Register of the City of Baltimore is designated in Article 4, section 25, of the Code of Public Local Laws. The duties of the officer are, in general, defined by the ordinances of the City of Baltimore.

Under section 7 of Ordinance No. 8, page 7, of the Revised Ordinances of 1850, it was made the duty of the City Register to keep regular and correct accounts in a book, or books, in folio, of all money received and expended by him on account of the city, particularly stating, under proper heads, the specific objects from whence received, and for what expended; and to lay annually before the City Council, in the first week of the annual session of that body, his account of *all* moneys received and expended by him during the past year, supported by proper vouchers.

The Mayor of the City of Baltimore had, under this ordinance, also the power to require the Register to exhibit to him *all* his accounts and vouchers, his bank-book and crossed checks. *Ordinance 1850, No. 8, section 7.*

It will be seen, by reference to Article 37, section 6, page 645 of the City Code for 1869, that the duties of the City Register, in the particulars referred to, remained unchanged in that interval of nineteen years. Indeed, the provisions of section 22 of Article 11, pages 165, 166, of the City Code for 1879, show that the duties and obligations of the City Register, in the particulars referred to, have not been changed since 1850.

It was, therefore, the duty of the City Register to keep an account of the particular moneys belonging to the

State, which he received from the Mayor and City Council of Baltimore, by virtue of his office as Register, and which he expended under the Act of 1864, chapter 15, and of his expenditures of that money in each year; and this account he was required to support by proper vouchers.

The Act of 1867, chapter 167, had no other purpose or effect, except to impose upoa the City Register the additional duty of reporting to the Comptroller of the Treasury, within the period which it prescribed, the accounts and vouchers connected with the distribution of the bounty fund, which it was the duty of the City Register to have kept and preserved.

The Mayor and City Council of Baltimore form a corporation, which was established for public political purposes, and as one of the means to be used by the State in the administration of public affairs.  *Mayor, &c. vs. State,* 15 *Md.,* 462.  It was, certainly, within the power of the State to compel this municipal agency to receive into its treasury any sum of money intended by the State to be applied to public uses; to require such money to be disbursed by the officer of the city corporation to whom the duty of keeping and disbursing the money of the city was entrusted; to impose upon him the duty of accounting for such money in the manner in which it might prescribe; and to make the city responsible for the proper application of such money by the officer to whose keeping it was confided.  *Mayor, &c. vs. State,* 15 *Md.,* 492; *County Commissioners of Anne Arundel County vs. Duckett,* 20 *Md.,* 477; *U. S. vs. Railroad Company,* 17 *Wallace,* 329; 1 *Dillon on Munic. Corp.,* (*2nd Ed.,*) *section* 168.

Nor can there be any question that the Mayor and City Council of Baltimore voluntarily assented, for itself and its Register, to the obligation imposed upon it by the Act of 1864, chapter 15; for, by Ordinance No. 47, approved March 15th, 1864, the Mayor and City Council of Baltimore appropriated the sum of one thousand dollars for

the purpose of paying for the services of an additional clerk, and for the books, paper and printing necessary to the payment of the bounty allowed by the State; and the Register of the city was authorized to employ such clerk, and to obtain such books, paper, etc., with the amount thus allowed.

The General Assembly, by the Act of 1864, chapter 15, sections 6 and 7, authorized the Mayor and City Council of Baltimore to receive the moneys therein referred to from the State. It directed the Register of the city to disburse this fund and to keep a record thereof. It declared that the City of Baltimore should be responsible for any misapplication of said funds. There can be no doubt that the Act, by its designation of the city officer who should perform the duty of disbursing this bounty money, in effect required that the officer thus designated should receive and disburse all portions of this fund in the manner in which he was required to disburse all public moneys, expended by him in his official character.

The State must certainly be supposed to have intended to avail itself of the obligation imposed upon the Register by the city ordinance, to which we have referred to keep an account, supported by proper vouchers, of all moneys received and expended by him.

That this was the intent of the Legislature plainly appears by the Act of 1867, chapter 167, which, in effect, directed the Register to make report to the Comptroller, in detailed form, of the amounts of bounty money which he had disbursed and of the names of parties to whom payments had been made, together with the proper vouchers therefor.

The Mayor and City Council of Baltimore had the power to protect itself fully from the responsibility for the Register, which was devolved upon it by the Act of 1864, chapter 15, by requiring the Register to give an additional bond for the indemnification of the city against any loss from his misapplication of this particular fund.

*James L. McLane, City Counsellor,* for the Mayor and City Council of Baltimore.

By the Act of 1864, chapter 15, the City Register, and not the *municipal corporation,* was constituted the agent of the State for the disbursement of its bounties, and nothing in the law justifies the attempt to hold the city for the acts of such State agent.

That the service required of the City Register was peculiarly a public or State service, appears on the face of the Act itself. It is entitled "An Act to aid and encourage enlistments into the Maryland Regiments in service of the United States." Its first section provides a bounty of three hundred dollars for every person who should enlist to serve "*as part of the quota of this State* in the armies of the United States."

In like manner "to every person who shall have already been in service six months and shall re-enlist before the 1st day of March next, *to serve as aforesaid, State bounty,* of three hundred dollars."

By section 6, the Governor was to ascertain what number of men the several counties and the City of Baltimore should furnish, under existing calls, and apportion the State bounty fund accordingly.

By section 7, the said County Commissioners and the Register of the City of Baltimore shall disburse the sums so coming "into their hands, and shall keep a record thereof; but no county nor the City of Baltimore shall draw for and be paid a larger sum than may be necessary for their respective quotas; and the several counties and the City of Baltimore shall be liable to the State for any misapplication of the said funds by the County Commissioners or City Register."

That the Register for the time being, and not the municipal corporation, was regarded as the State's agent, by all concerned in the execution of the law, is abundantly proved by the dealings of the parties themselves.

There has been no attempt to prove that the municipal corporation, by either ordinance or resolution, ever authorized the City Register or any other city official to prepare and forward to the Governor the authenticated lists of volunteers, and to draw upon the State Treasurer for the bounty fund as provided in section 6 of the Act of 1864, ch. 15. The fact is beyond dispute that the Mayor and City Council of Baltimore took no such action in the premises. From the beginning, the City Register regarded himself as fully authorized to receive and disburse the fund as the agent of the State, in no way accountable to the municipal authorities—as such, he was uniformly recognized by both the Governor and the Treasurer. And the entire bounty fund was paid to him upon drafts drawn without any direction from the city.

When the Act of 1867, ch. 167, requiring " the *several parties,* or bodies corporate, intrusted with the distribution of these bounty funds to report to the State Comptroller,'' was passed, John A. Thompson, who had been out of office for more than a year, and not the Mayor and City Council of Baltimore, was called upon by the State Comptroller for an account of his disbursements, and was allowed to deposit with the Comptroller a box of vouchers, which, upon the theory of the State's case, clearly belonged to the municipal corporation, and should have been in its custody. In all this, the Comptroller, as the Governor and Treasurer before him had done, dealt directly with Thompson as its agent.

The provisions contained in section 7 of the Act, and now relied on by the State, " that the several counties and the City of Baltimore shall be liable to the State for any misapplication of the said funds by the County Commissioners or City Register," does not in any way conflict with the interpretation put upon the Act by all the officials, State and city, who were required to act under it. By that provision, nothing more was intended than to

guard against the State's funds being used for county or city purposes. From being "misapplied" in the sense of being applied to uses other than those for which the fund had been specially set apart. So long as the Register in good faith applied the funds intrusted to him to the payment of State bounties, there was no such "misapplication" as the Act of Assembly could have intended to make the city liable for.

To this extent the provision making the city liable was most reasonable. The city could rightly be made responsible for any misapplication of the fund by its Register *acting in his capacity of an officer of the municipal corporation.* Because, as such, he was absolutely subject to municipal control. But for losses resulting from mistakes of judgment or neglect of duty on the part of the Register while acting as the State's agent, or disbursing officer, the Register and not the municipal corporation must be looked to.

The control of the Legislature over the municipal corporation, so fully recognized by the decisions of this Court, does not extend to a case like the present. The cases relied upon by the State at the trial of the case, established nothing more than the proposition that public officers *appointed by the State* to perform *municipal functions,* can render the corporation liable to *third parties,* to the same extent as if such officials had been appointed directly by the municipal corporation.

"The power of the Legislature over such corporations is not absolute or unlimited." *Pumphrey's Case,* 47 *Md.,* 152.

The duty imposed must fall within the ordinary functions of municipal government. *Cooley on Con. Lim.,* 230, 231; *People vs. Batchelor,* 53 *N. Y.,* 128.

While it may very well be that the State can avail itself of the machinery of city government for the disbursement of a State bounty fund, it by no means follows that it can

require the tax-payers of the city to *guarantee* the faithful and intelligent discharge of *public* duties, by any one of the city officials, upon whom the State shall see fit to impose duties clearly beyond the scope of such officer's *municipal appointment,* and not embraced in his official bond.

· The evidence tending to prove payments, objected to by the State, was clearly admissible. The Act of 1864, chap. 15, prescribed no particular form of payment or receipt. The only requirement was that the Register should keep a record of his disbursements. Whether payment should be made to each soldier in person, or upon his order, and whether such order should be in writing and how evidenced, were all matters confided to the discretion of the Register, and his decision thereon was absolutely final. *Allen vs. Blunt,* 3 *Story,* 742 ; *Noble vs. U. S., Devereux Court of Claims,* 84.

The Register could not be required under the Act of 1867, chap. 167, to produce any different vouchers from those he was required to keep by the Act of 1864, chap. 15. Having produced his record of disbursements, and its correctness being disputed, upon what principle of justice can he be denied the right to prove the fact that the disbursements were in fact made as claimed? Here the proof is furnished by the person who actually made every one of the payments.

John A. Thompson, Jr., swears that in all cases where he paid the parties themselves, he was first satisfied that they were properly entitled to receive the bounty, and that in all such cases he took receipts.

In all cases where payment was made to attorneys or agents of soldiers, he required the production of written authority or powers of attorney, and that such papers were left in the Register's office upon the retirement of his father.

If the Act of Assembly had prescribed any particular form of voucher, whether power of attorney, money order,

or receipt, it was clearly competent for the defendant to establish the existence of such vouchers by the evidence offered at the trial.

The proof by Thompson, Jr., and Plummer was, that the *invariable practice* of the Register's office was to require proper and sufficient powers of attorney, orders or assignments, and in all cases of doubt, to consult the City Counsellor.

Twenty-three persons, who had dealt with the office, and collected soldiers' bounties in a great number of cases, proved the same practice of the office, and that they were always required to conform to it. Thompson, Jr., proved the loss of the papers; and an unavailing search for them in the places where they should have been found, was proved by Thompson, Jr., and the State's own witness, Woolford, *under whose desk the papers relating to the bounty business which had been forwarded by the city register* have been kept in an open box for several years.

A public officer is competent to prove that according to the *invariable practice of his office,* certain entries made by him as such public officer, could only have been made upon the production and filing with him of a certain *written instrument,* the existence of which is the subject in dispute. *Bouldin vs. Massie's Heirs,* 7 *Wheat.,* 122.

MILLER, J., delivered the opinion of the Court.

This cause, in which cross appeals have been taken, was tried before the Court without the intervention of a jury, and in such case, equally as in jury trials, only questions of law are open for review in this Court. Those questions in the present case are but few, and do not require an examination of all the numerous provisions of the several Bounty Acts referred to in the record and in argument. Some of the rulings of the Superior Court, however, present questions as to the validity, construction and effects of certain parts of those laws, and these must be briefly stated.

1st. By the Act of 1864, ch. 15, (which was the first of these laws,) the Governor was authorized to offer a bounty of $300 to every person, who should before the 1st of March, 1864, voluntarily enlist to serve, as part of the quota of this State, in the armies of the United States, and of this sum it was provided that $150 should be paid at the time such person should be mustered into the service of the United States, and $20 at the end of each month of service for the five months immediately ensuing, and $50 at the expiration of his term of service or upon his honorable discharge therefrom.   By another section of the same Act it was provided " that the Governor shall, as soon as may be, notify the Commissioners of the several counties, and the Mayor and City Council of Baltimore, of the number of men for which they are liable to be drafted under existing calls by the Federal Government, and the said Commissioners or Mayor, or City Council, upon forwarding to the Governor *properly authenticated lists* of volunteers mustered in under this Act, in their respective counties and the City of Baltimore, are hereby authorized and empowered, *upon the certificate of the Governor*, to draw upon the Treasurer for the sum or sums necessary to pay the cash and monthly payments to which *said volunteers* would be entitled, as the same may become due, retaining in the Treasury the balance until the expiration of their term of service."

The testimony in the case shows the mode in which this provision of the law was executed.   A large number of these lists, duly authenticated by the proper military officials, were forwarded to the Governor, and are termed in the record the "Governor's Rolls," and we shall take the first one as illustrating what was done in the case of each and all of them.   This list contains the names of one hundred and twenty-four persons, and upon its receipt the Governor appended thereto his ·certificate, directed "To the Mayor and City Council of Baltimore,": stating in sub-

stance that "having been furnished by the proper authorities with authenticated lists of a portion of the volunteers from this State who have been mustered into the military service of the United States, and who are entitled to the State bounty provided" by the Act of 1864, and that "it appears by the lists so furnished that the volunteers mentioned and described in the annexed list are properly to be credited to Baltimore City as part of the State's quota of men called for by the President's Proclamations," and "*you* are therefore, in accordance with the Act of the Legislature referred to, entitled to receive from the Treasury of the State the sum of $31,000, being the amount required to make the cash and monthly payments to the one hundred and twenty-four volunteers whose names are hereby appended," and "*you* are therefore authorized to draw upon the Treasurer of the State for said amount as per draft hereto annexed, which you will sign and present at the Treasury." Then follows, endorsed upon this certificate, the draft upon the Treasurer, signed by "John A. Thompson, City Register," for that sum, "it being the amount required to make the cash and monthly payments to the one hundred and twenty-four volunteers within named, under the provisions of the Act" of 1864, upon which the money was duly paid by the Treasury officers to the Bank named as payee therein. It is very clear that this action was in strict compliance with this provision of the law, for its terms plainly enough declare that the money so drawn from the Treasury should be applied *only* for the purpose of making the requisite payments to, or for the benefit of, the persons whose names should appear *on the lists* thus forwarded to and certified by the Governor.

Then in order to secure the proper disbursement of the money taken from the Treasury and received by the city and counties, it was provided by another section of the same Act "that the said County Commissioners and the Register of the City of Baltimore shall disburse the sums

so coming into their hands, *and shall keep a record thereof;* but no county nor the City of Baltimore shall draw for and be paid a larger sum than may be necessary for their respective quotas; and the several counties and the City of Baltimore shall be liable to the State for any *misapplication* of the said funds by the County Commissioners or City Register." It is contended, on the part of the city, that by this enactment the City Register was constituted a State agent for the disbursement of this fund, and that it was not competent for the Legislature to make the city liable for his default. Now while it may be conceded that the power of the Legislature over public municipal corporations is not in all respects absolute or unlimited, yet we think it was within the scope of such power and control to impose the duty and liability contained in this provision. It is now too well settled by authority to admit of doubt, that the Legislature had the power to pass a Bounty Act like this, appropriating money from the Treasury, for the purpose of relieving the citizens of the State from the burthen of an involuntary draft, and it could have granted permission to the counties and the City of Baltimore to raise money by taxation for that purpose. *Cooley on Cons. Lim.,* 221. This law then in effect is nothing more than an appropriation of various sums of money for the relief, and for the benefit of the people of the several counties and the City of Baltimore respectively. It deals directly with the counties and the city in their corporate and municipal relations, authorizes the money to be drawn by their respective corporate authorities, and designates officers appointed by the Mayor and City Council or elected by the people of the counties as the proper agents to disburse the money in the mode and manner provided, and all this is to be done for the relief and benefit of the people of the city and counties respectively. Why then was it not competent as well as just to impose upon the counties and the city liability for the default of such officers in the

discharge of this public duty thus required of them? It has been repeatedly decided by this Court that where a statute imposes a duty upon a county or municipal corporation, and provides it with the means, and clothes it with the power to enforce or discharge that duty, liability to any one injured by a neglect to perform or a negligent performance, follows without any express statutory provision to that effect. The cases on this subject are considered and reviewed in *Flynn vs. Canton Co.*, 40 *Md.*, 312. Here liability to the State, is expressly provided by the statute, and we entertain no doubt as to the power of the Legislature to impose it. It is next insisted that by the term "misapplication" as here used, nothing more was intended than to guard against the use of the State's funds for county or city purposes, but this in our opinion, places too narrow a construction upon the language employed, and one not justified by the general tenor and purpose of the Act. This law, as we have shown, very carefully specifies the persons to whom, or for whose benefit, the money was to be disbursed, and we think it very clear that disbursements to parties whose names do not appear on the "Governor's Rolls," or payment to the same person more than once, are *misapplications* within the meaning of the statute, and for the amount of these the city was properly held liable. For that amount alone was the judgment against the city rendered.

For the reasons thus stated we find no error in the rulings of the Superior Court leading to that result, and this disposes of the appeal taken by the city.

2nd. This brings us to the rulings which resulted in the rejection of other amounts claimed by the State. These are made up of payments alleged and purporting to have been made to or for parties whose names are on the lists furnished to the Governor, but for which the State insists no sufficient vouchers have been produced, and the fact of proper payment not otherwise sufficiently proved. The

principal ground upon which the State founds its claim to recover these sums is the non-production in the instances specified of duly executed and legally sufficient powers of attorney where payments were made to claim agents or other parties than the volunteers themselves. As to this question we agree substantially with the views taken of it by the learned Judge below in his opinion, which appears in the record, and by the City Counsellor in his brief. The Act of 1864 prescribes no particular mode of payment nor does it direct what vouchers therefor shall be taken or preserved. Its only requirement is that the Register " shall keep a record" of his disbursements, and, as we understand the testimony in the case, that was done. A record was kept in which the disbursements were regularly and duly entered when and as they were respectively made. Whether payment should be made to each volunteer in person, or upon his order, and whether such order should be in writing and how evidenced, were all matters entrusted to the discretion of the Register, and his decision thereon, if honestly made, was final. Where duties of this character are devolved upon a public officer, and no particular provision is made in the statute as to how they shall be discharged, his action in the premises, unless impeached for fraud, or manifestly in excess of his authority, must of necessity be conclusive. As said by Judge STORY, in *Allen vs. Blunt*, (3 *Story's C. C. Rep.*, 745,) "It may be laid down as a general rule that where a particular authority is confided to a particular officer, to be exercised by him in his discretion upon an examination of facts of which he is made the appropriate judge, his decision upon these facts is, in the absence of any controlling provision, absolutely conclusive as to the existence of those facts." Here the law in question contemplated the disbursement of large sums of money in small amounts to a very large number of volunteers who, as soon as mustered into service, were liable to be, and were in fact, sent away and

employed in distant parts of the country. In that case, payments, at least of the five monthly instalments as they respectively fell due, were of necessity made to agents upon orders or under powers of attorney. By a resolution of the Mayor and City Council, adopted in March, 1864, shortly after the passage of this Bounty Act, the Register was authorized to employ an additional clerk for the purpose of aiding him in the discharge of the duty of disbursing this bounty money, and this clerk, together with the Register himself, who made most of the disbursements, and his successor in office who made the rest, all testify to the effect that it was the invariable practice of the Register's office to require proper and sufficient powers of attorney, orders or assignments, and in all cases of doubt to consult the City Counsellor; that such orders or powers of attorney were in all cases before them when disbursements were made thereon, and entries of such disbursements were at once made in the record thereof, and that in no case would any payment have been made without the production and existence of such vouchers. That it is competent for a public officer to prove that according to the invariable practice of his office certain entries made by him as such public officer could only have been made upon the production and filing with him of a certain written instrument, the existence of which was the subject in dispute, seems to have been decided by the Supreme Court in the case of *Bouldin vs. Massie's Heirs,* 7 *Wheat.,* 122. One of the questions in that case was whether an assignment of a land-warrent could be proved by the testimony of the public officer with whom it should have been filed, to the effect that an entry made by himself in the name of the assignee would only have been made upon the production of a proper assignment of the warrant, and in considering that question, Chief Justice MARSHALL says, "It is impossible to read the testimony of the principal surveyor, or to credit it, without believing that an assignment purporting

to be made by Jonitte to Massie was produced by Massie and deposited in his office. His fixed rule to require the production of an assignment before an entry in the name of the assignee could be permitted, his averment that he never departed from that rule except in a single instance, his clear recollection of the circumstances attending that instance, his admission of entries in the name of Massie as assignee in the life-time of Jonitte, his averment that the assignment was placed in his office and taken out with the plats and certificates of survey by Massie, prove that there must have been such a paper." The testimony of these Registers and of their clerk is quite as strong as that of the surveyor in the case cited, and their testimony is corroborated by that of a large number of witnesses who had dealings with the office and to whom payments were made upon powers of attorney not now produced. It seems to us that this proof is sufficient to establish the fact that vouchers which the Register in good faith decided to be sufficient to authorize payments thereunder, in cases where they have not been produced and are alleged to be lost, once existed. We are also of opinion that the loss of these papers and an unavailing and sufficient search for them in the places where they were kept and where they ought to have been found if in existence, are sufficiently established by the proof in the record, and therefore, that the Court was right in holding that the testimony of these witnesses was admissible to prove the contents of these lost vouchers, and that under the circumstances of this case, their contents are sufficiently proved to justify the exoneration of the city from liability for the payments in dispute made thereunder. From this it follows there was no error in the rulings against the State. This disposes of the State's appeal, and the result is that the judgment must be affirmed.

In thus disposing of the case, we have not overlooked the supplementary Bounty Acts, but find nothing in any

of them to induce us to modify the views expressed in this opinion. Of course the Register could not be required under the Act of 1867, chap. 167, to produce any different vouchers from those he was required by the Act of 1864 to keep. The disbursements in controversy were all made under the provisions of that Act, and the duty of the Register as well as the liability of the city are governed by its provisions.

By the Act of 1878, chap. 61, it is provided that "upon the reversal or affirmance of the judgment of a Court of law, the Court of Appeals shall award the costs which may have accrued in the Court below, and in the Court of Appeals, in such manner as to the said Court seems right and proper." In pursuance of this authority, we adjudge that all costs that have accrued in the Court below shall be paid by the city, and that three-fourths of the costs that have accrued in this Court shall be paid by the State and one-fourth by the city. In disposing of the costs in this Court, we have considered that both parties have appealed and neither has been successful in reversing the judgment, and have therefore apportioned the costs very nearly in the proportion that the amount recovered by the State bears to the amount she claimed in the Court below.

*Judgment affirmed, with costs*
*to be paid as directed in the opinion.*

(Decided 16th July, 1879.)